**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**Wilcox Industries Corp.**

    **v.**
                                  Case No. 11-cv-551-PB
                                        Opinion No. 2012 DNH 092

**Mark Hansen,
Advanced Life Support
Technologies, Inc.**

**MEMORANDUM AND ORDER**

    Wilcox Industries Corporation ("Wilcox") filed a complaint against Mark Hansen and Advanced Life Support Technologies, Inc. ("ALST"), alleging misappropriation of trade secrets and unfair competition, among other state law claims.  Defendants move to dismiss all claims for failure to state a claim upon which relief may be granted.  Alternatively, they have filed a motion for a more definite statement of claims.  For the reasons provided below, I grant in part and deny in part the motion to dismiss and deny the motion for a more definite statement.

## I.  BACKGROUND

    Wilcox manufactures military equipment, including a self-contained breathing apparatus that can be used in hazardous or contaminated environments.  The device was initially called the

SCOUT, and is now called the PATRIOT.  Wilcox is currently
working on developing the next-generation PATRIOT.

Hansen served as a consultant to Wilcox from 2003 until
2005, when Wilcox hired him as a full-time employee.  He
continued to work at Wilcox until June 2007, when he left the
company to work as President of ALST, a company he founded in
2006.

During his tenure at Wilcox, Hansen was a member of the
design teams that created the SCOUT/PATRIOT life support device.
He had access to confidential information regarding Wilcox's
advanced life support technology, including technical
information relating to the development of the next-generation
PATRIOT product.  To protect the confidentiality of Wilcox's
proprietary information, Wilcox and Hansen entered into a
Nondisclosure and Nonsolicitation Agreement ("NDA") in 2003,
whereby Hansen agreed to hold and maintain Wilcox's
"confidential information" in the strictest confidence for the
sole and exclusive benefit of Wilcox.  The NDA defines
confidential information to include all trade secrets,
proprietary information, inventions, discoveries, methods,
formulas, and the like.  The NDA stipulates that the parties'

obligations under the agreement survive termination of the business relationship.

At the same time, Hansen entered into a Royalty Agreement with Wilcox, under which he agreed to assign to Wilcox "all right[s], title, and interest in and to intellectual property, including rights under patent and copyright law, relating to the SCOUT or any products developed or relating to the SCOUT." Compl. ¶ 17, Doc. No. 1. In exchange, Wilcox agreed to pay Hansen a royalty amount based on the net billings for sales of the SCOUT and related accessories.

In August 2004, Hansen and several other Wilcox employees were named as inventors on a patent application for Wilcox's self-contained breathing apparatus technology that would later be used to create the SCOUT/PATRIOT. Several months later, Hansen entered into an Assignment Agreement with Wilcox, in which he assigned to it the full and exclusive rights, title, and interest to the patent application for the SCOUT technology. Much of the technology encompassed in the device is contained in Wilcox's published patent. That patent, however, does not disclose proprietary technical information about Wilcox's next-generation PATRIOT product.

3

Shortly after Hansen left Wilcox in 2006 to become the President of ALST, Wilcox and ALST entered into a consulting agreement.  ALST agreed to serve as a consultant for Wilcox in the design and manufacture of its respirator systems and to provide training and support for those systems to Wilcox's customers.  Hansen was the sole representative of ALST who thereafter provided consulting services to Wilcox.  He traveled with Wilcox's employees to various customer locations throughout the world to market Wilcox's current PATRIOT product and to train customers on how to use the device.  While serving as a representative of Wilcox in his consulting role, Hansen simultaneously marketed his own competing products and company to Wilcox's customers.

During the consulting relationship, Hansen also participated in meetings and communications that made him privy to confidential proprietary information regarding the development of Wilcox's next-generation PATRIOT device.  Through those activities, Hansen and ALST were entrusted with trade secrets regarding the device, as well as confidential information about Wilcox's customers.

4

When the consulting relationship ended in February 2009,
Hansen and ALST began to capitalize on the know-how they
acquired while working with Wilcox.  In spite of his obligations
under the NDA, Hansen incorporated Wilcox's confidential and
trade secret information pertaining to its next-generation life
support device into ALST's competing product known as the
SHIELD.  In developing that product, Hansen also used the same
technology that he had assigned to Wilcox in the Royalty
Agreement, although he continued to receive royalties.

Hansen and ALST then began soliciting Wilcox's existing and
prospective customers to purchase ALST's competing product using
the confidential customer information and contacts that Wilcox
had entrusted to them.  In one instance, ALST entered into a
contract to sell SHIELD units to the Los Angeles County
Sheriff's Department.  Hansen was aware that Wilcox was
marketing its own PATRIOT product to this prospective customer.
A final agreement was essentially in place between Wilcox and
the Sheriff's Department when the contract was awarded instead
to ALST.

Defendants also solicited Wilcox's customers by offering to
service the PATRIOT products that had been previously purchased

from Wilcox.  Because Hansen is not a certified technician of
Wilcox's products, any service work he performs on those
products voids the warranty that Wilcox offers to its customers.
While marketing their own products, Hansen and ALST also made
"harmful false statements about Wilcox and its technology" to
Wilcox's customers.  Comp. ¶ 67, Doc. No. 1.

## II.  <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss under Rule 12(b)(6), a
plaintiff must make factual allegations sufficient to state a
claim to relief that is plausible on its face.  See <u>Ashcroft v.
Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  A claim is facially
plausible when it pleads "factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged.  The plausibility standard is not
akin to a 'probability requirement,' but it asks for more than a
sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>
(citations omitted).

In deciding a motion to dismiss, I must employ a two-
pronged approach.  See <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640
F.3d 1, 12 (1st Cir. 2011).  First, I must screen the complaint

for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action."  Id. (citations, internal quotation marks, and alterations omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  Second, I must credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then determine if the claim is plausible.  Id.  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).  The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ." (citation omitted)).

### III.  ANALYSIS

Wilcox alleges the following claims against both defendants: (1) misappropriation of trade secrets in violation of New Hampshire's version of the Uniform Trade Secrets Act; (2) common-law unfair competition; (3) unfair competition in violation of the New Hampshire Consumer Protection Act; and (4) intentional interference with contractual relations.  Wilcox asserts four additional claims against Hansen: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; and (4) unjust enrichment.  Defendants move to dismiss all claims for failure to state a claim upon which relief can be granted.  They argue that the common-law and statutory unfair competition, intentional interference with contractual relations, unjust enrichment, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing claims are all preempted by the New Hampshire Uniform Trade Secrets Act ("NHUTSA").  In addition, they contend that all claims are insufficiently pled. I discuss the preemption argument and the sufficiency of pleadings in turn.[1]

---

[1] The parties treat all causes of action as subject to New

**A.    Preemption by NHUTSA**

Defendants argue that the NHUTSA preempts Wilcox's tort claims.  The NHUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." N.H. Rev. Stat. Ann. § 350-B:7, I.  The only exceptions to this provision are claims for contractual remedies, criminal remedies, and "[o]ther civil remedies that are not based on misappropriation of a trade secret." Id. § 350-B:7, II.

The preemption provision was designed to "preserve a single tort action under state law for misappropriation of a trade secret as defined in the statute and thus to eliminate other tort causes of action founded on allegations of misappropriation of information that may not meet the statutory standard for a trade secret." Mortgage Specialists, Inc. v. Davey, 153 N.H 764, 776 (2006) (internal quotation marks omitted).  In essence, the NHUTSA classifies information either as a protected trade secret, as defined in the statute, or as unprotected general knowledge.  Id. at 777.  Claims based on unauthorized use of

Hampshire law.  I adopt that assumption without conducting a choice of law analysis.

confidential information are preempted even if the information at issue is not a trade secret.  <u>Id.</u>

The preemption provision applies when a claim is "based solely on, or to the extent that it is based on, the allegations or the factual showings of unauthorized use of information or misappropriation of a trade secret."  <u>Id.</u> at 778 (internal quotation marks, alterations, and ellipses omitted).  Thus, the facts alleged in support of a claim, rather than the label attached to it, determine whether that claim is preempted.  <u>Id.</u> A claim survives to the extent that it alleges wrongful conduct independent of any alleged unauthorized use of information, provided that the independent allegations are sufficient to plead all elements of the claim.  <u>See</u> <u>id.</u>

Here, Wilcox contends that defendants misappropriated confidential and trade secret information related to its next-generation PATRIOT device and its customers.  To the extent that Wilcox relies on the same factual allegations for its remaining tort claims, those claims are preempted by the NHUTSA.  Wilcox, however, makes further factual allegations that are not related to unauthorized use of information, namely that: (1) defendants marketed ALST and its competing SHIELD product to Wilcox's

10

customers while ALST was acting as a consultant to promote

Wilcox's PATRIOT device; (2) after the consulting relationship

ended, defendants made "harmful false statements" about Wilcox

and its technology to Wilcox's customers; and (3) defendants

solicited Wilcox's customers by offering to service Wilcox's

products without being certified to do so.  I analyze the

elements of each non-NHUTSA tort claim to determine whether the

factual allegations supporting the claim are sufficient to state

a claim for relief.[2]

### 1.   Unfair Competition

Wilcox asserts claims for unfair competition at common law

and under the New Hampshire Consumer Protection Act.  I analyze

each claim in turn to determine whether Wilcox has stated a

claim upon which relief can be granted.

---

[2] I rely on a different rationale in rejecting defendants'
argument that Wilcox's claim for breach of the implied covenant
of good faith and fair dealing is preempted.  The type of good
faith and fair dealing claim at issue here is a contract claim
rather than a tort claim.  See, e.g., Bennett v. ITT Hartford
Group, Inc., 150 N.H. 753, 757 (2004) (distinguishing contract
and tort claims for a breach of the duty of good faith and fair
dealing).  Thus, it is exempt from the NHUTSA preemption
provision.  See N.H. Rev. Stat. Ann. § 350-B:7, II.

### a.   Common-Law Unfair Competition (Count III)

Wilcox contends that the defendants are liable for unfair competition because, in competing with Wilcox for business, defendants: (1) improperly used Wilcox's trade secret and property information; (2) used intellectual property that Hansen had assigned to Wilcox in exchange for royalty payments; and (3) made "harmful false statements" about Wilcox to its customers. Wilcox's first argument is preempted by the NHUTSA because it turns on the contention that defendants injured Wilcox through the unauthorized use of confidential information.  Its second argument is a nonstarter because it is either (i) a straightforward claim that defendants have infringed its patent rights, which is maintainable if at all under federal patent laws, see generally Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 235 (1st Cir. 2005) (discussing general issue of patent preemption), or (ii) it is an attempt to transform a claim for breach of the royalty agreement into a tort claim for unfair competition.  The New Hampshire Supreme Court has given no sign that it would recognize a claim for unfair competition in either case. Assuming without deciding, however, that New Hampshire would

12

recognize a viable unfair competition in a case where someone "engages in conduct which deceives the general buying public," Optical Alignment Sys. & Inspection Servs., Inc. v. Alignment Servs. of N. Am., Inc., 909 F. Supp. 58, 61 (D.N.H. 1995) (quoting Salomon S.A. v. Alpina Sports Corp., 737 F. Supp. 720, 722-23 (D.N.H. 1990)), Wilcox has stated a minimally sufficient claim for unfair competition by commercial disparagement. Accordingly, I decline to dismiss its claim for unfair competition.

### b.   New Hampshire Consumer Protection Act (Count IV)

The New Hampshire Consumer Protection Act ("NHCPA") prohibits the use of "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358-A:2. The Act provides a non-exhaustive list of prohibited practices, including "[d]isparaging the goods, services, or business of another by false or misleading representation of fact." Id. § 358-A:2, VIII.  In addition to the expressed prohibitions, courts use the so-called "rascality" test to determine which non-delineated commercial actions fall within the Act.  Under this test, "the objectionable conduct must attain a level of

rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011).

Here, the only allegations not preempted by the NHUTSA are Wilcox's claims that (i) defendants made "harmful false statements" to its customers, (ii) marketed ALST's competing products to those customers while purporting to promote Wilcox's products as consultants for the company, and (iii) solicited Wilcox's customers by offering to service its products without being certified to do so.  Assuming without deciding that this conduct qualifies as "unfair or deceptive" conduct as defined by the statute, Wilcox's claim still must fail.  The NHCPA permits relief only for unfair competition that occurs "within this state." N.H. Rev. Stat. Ann. § 358-A:2.  Wilcox has not alleged that defendants made any false statements about Wilcox to customers in New Hampshire, nor has it asserted that they marketed competing products or services to New Hampshire customers.  There is simply no allegation that any offending conduct occurred in New Hampshire.  Although Wilcox alleges that the harm from defendants' conduct occurred in New Hampshire, where Wilcox has its principal place of business, that fact

14

alone is insufficient to bring the offending conduct within the fold of the NHCPA.  See Mueller Co. v. U.S. Pipe & Foundry Co., No. Civ. 03-170-JD, 2003 WL 22272135, at *6 (D.N.H. Oct. 2, 2003) ("In the absence of any alleged unfair method of competition or unfair or deceptive act or practice which took place within New Hampshire, the harm suffered by [the plaintiff] within the state does not state a claim under RSA 358-A:2."); see also Environamics Corp. v. Ferguson Enters., Inc., No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001) ("The limitation in RSA 358-A:2 to 'conduct of any trade or commerce within this state' has been interpreted to mean that the statute only applies to offending conduct that took place within New Hampshire."); Pacamor Bearings, 918 F. Supp. at 504 (noting that "other courts interpreting similar language have found that the 'in this state' language clearly indicates that the statute is only applicable if *the offending conduct* took place within the territorial borders of the state" (internal quotation marks and alterations omitted)).

In the absence of an allegation not otherwise preempted by the NHUTSA that defendants engaged in unfair or deceptive acts within New Hampshire, Wilcox can prove no set of facts which

15

would entitle it to relief on the statutory claim of unfair competition.  Accordingly, I grant defendants' motion to dismiss that count from the complaint.

**2.   Intentional Interference with Contractual Relations (Count VIII)**

In its complaint, Wilcox asserts a claim for intentional interference with contractual relations.  New Hampshire recognizes two distinct tortious interference theories: intentional interference with existing contractual relations and intentional interference with prospective contractual relations.  See Nat'l Emp't Serv. Corp. v. Olsten Staffing Serv., Inc., 145 N.H. 158, 162 (2000); Baker v. Dennis Brown Realty, Inc., 121 N.H. 640, 644 (1981).  Wilcox appears to combine both torts into a single claim.  A close analysis of its allegations, however, demonstrates that Wilcox has asserted a viable claim only for intentional interference with prospective contractual relations.

**a.   Intentional Interference with Existing Contractual Relations**

To state a claim for intentional interference with existing contractual relations under New Hampshire law, Wilcox must show that: "(1) it had a contractual relationship with [a third party]; (2) [defendants] knew of the contractual relationship;

(3) [defendants] wrongfully induced [the third party] to breach the contract; and (4) [Wilcox's] damages were proximately caused by [defendants'] interference." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 229 F. Supp. 2d 70, 73 (D.N.H. 2002) aff'd, 374 F.3d 23 (1st Cir. 2004) (citing Roberts v. Gen. Motors Corp., 138 N.H. 532, 539 (1994)). Wilcox must, therefore, allege that defendants improperly and intentionally interfered with an existing contract between Wilcox and a third party by causing either party to commit a breach. See id. ("Because [the third party] never breached its [contract] with [the plaintiff], [the defendant] cannot be liable on [the] interference with contractual relations claim, even if it improperly attempted to interfere with the relationship between [the third party] and [the plaintiff]."); see also Demetracopoulos v. Wilson, 138 N.H. 371, 373-74 (1994); Montrone v. Maxfield, 122 N.H. 724, 726 (1982); Restatement (Second) of Torts § 766 (1979).

Wilcox alleges generally that defendants interfered with its customer relationships but it does not allege any existing contract that was terminated as a result of defendants' misconduct. Accordingly, I treat Wilcox's interference claim as a claim for interference with prospective contractual relations.

b.   __Intentional Interference with Prospective Contractual Relations__

A claim for intentional interference with prospective contractual relations exists under New Hampshire law when "[o]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to . . . enter into or continue a business relation with another" and thereby causes harm to the other." Synopsys, 229 F. Supp. 2d at 73-74 (quoting Baker, 121 N.H. at 644).  To prevail on such a claim, Wilcox must show that: "(1) [it] had an economic relationship with a third party; (2) the defendant[s] knew of this relationship; (3) the defendant[s] intentionally and improperly interfered with this relationship; and (4) [Wilcox] was damaged by such interference." M & D Cycles, Inc. v. Am. Honda Motor Co., Inc., 208 F. Supp. 2d 115, 119 (D.N.H. 2002) aff'd, 70 F. App'x 592 (1st Cir. 2003).  The asserted economic relationship must "give rise to a reasonable expectation of economic advantage." Preyer v. Dartmouth Coll., 968 F. Supp. 20, 26 (D.N.H. 1997) (quoting Heritage Home Health, Inc. v. Capital Region Health Care Corp., Civ. No. 95-558-JD, 1996 WL 655793, at *4 (D.N.H. Oct. 1, 1996)).

Because the law provides greater protection to a party's interest in an existing contract than in a prospective one, the scope of actionable conduct is narrower in the latter instance. Restatement (Second) of Torts § 767 cmt. j (1979).  Thus, certain types of conduct such as fraud or threats of physical violence ordinarily will be sufficient to support a claim for interference with a prospective contractual relationship, but the use of ordinary means of persuasion or the exertion of limited economic pressure will not, by itself, be sufficient. Id.

Wilcox has pled both that it had relationships with its existing customers that gave rise to a reasonable expectation of economic advantage, and that defendants had firsthand knowledge of those relationships through Hansen's employment with Wilcox. With respect to the third prong of the claim, Wilcox alleges that in the course of soliciting business from Wilcox's customers, defendants made "harmful false statements" about Wilcox and its products.  Inducing a third person by fraudulent misrepresentations or defamatory statements not to do business with the plaintiff can constitute wrongful conduct sufficient to support an interference with a prospective contractual

relationship claim.  Restatement (Second) of Torts § 767 cmt. c
& § 768 cmt. e; see Liberty Leather Corp. v. Callum, 653 F.2d
694, 699 (1st Cir. 1981) ("Undoubtedly a cause of action for
tortious interference with business relations may rest upon
defamatory remarks.").

Therefore, Wilcox has stated a viable claim for intentional
interference with prospective contractual relations based on the
above-described theory.

### 3.    Breach of Fiduciary Duty (Count VI)

Wilcox asserts a claim for breach of fiduciary duty against
Hansen.  Under New Hampshire law, a fiduciary relationship is
defined broadly and "exists wherever influence has been acquired
and abused or confidence has been reposed and betrayed." Lash
v. Cheshire Cnty. Sav. Bank, Inc., 124 N.H. 435, 438 (1984)
(quoting Cornwell v. Cornwell, 116 N.H. 205, 209 (1976)).
Wilcox asserts that Hansen, as a Vice President of Wilcox, owed
fiduciary duties to the company.  In the course of its
relationship with Hansen, Wilcox reposed a special confidence in
Hansen not to disclose or otherwise improperly use Wilcox's
confidential and trade secret information regarding its next-
generation PATRIOT product or its customers.  The complaint also

20

alleges that Hansen breached his obligations as a fiduciary by using the entrusted information to develop a competing life support device and to market and sell this device to Wilcox's customers through ALST.  Wilcox does not assert that ALST breached any fiduciary duty it may have owed to Wilcox as a consultant.

Assuming that Wilcox's allegations are sufficient to state a claim against Hansen for breach of fiduciary duty, the claim is preempted by the NHUTSA.  To evade preemption, Wilcox makes two arguments, both equally meritless.  First, it argues that the information it entrusted to Hansen is not limited to trade secrets or confidential information, but includes other "proprietary information," and thus its breach of fiduciary duty claim is not based "solely on" the allegations of trade secret misappropriation.  As I have explained, however, claims based on unauthorized use of information are preempted even if the information at issue is not a trade secret.  Mortgage Specialists, 153 N.H. at 776-77.  Second, Wilcox contends that the elements of its breach of fiduciary duty claim require it to show that the parties were engaged in a fiduciary relationship, which is an element independent of the allegations that also

form the basis for its misappropriation claim.  Again, Wilcox misconstrues the effect of the preemption provision.  A claim is preempted when it is dependent upon facts necessary to establish a misappropriation claim, regardless of whether surplus elements or proof are necessary to establish it.  See id.  Interpreting the NHUTSA as preempting only those claims that have the same elements as a misappropriation of trade secrets claim would render the preemption provision meaningless.  See id.

Because Wilcox has failed to base its breach of fiduciary duty on facts independent of the claim that defendants misappropriated Wilcox's trade secrets, the claim is preempted by NHUTSA.

### 4.   Unjust Enrichment (Count VII)

Wilcox also asserts a claim for unjust enrichment, alleging that Hansen has been unjustly enriched by receiving royalties while simultaneously (1) using the same intellectual property he assigned to Wilcox in the Royalty Agreement to compete unfairly against Wilcox, and (2) soliciting Wilcox's customers to sell a competing product that incorporates the assigned technology. Hansen contends that the claim is preempted by the NHUTSA.[3]

---

[3] The parties treat the unjust enrichment claim as a tort claim,

To prevail on the claim, Wilcox would have to "show[] that there was unjust enrichment either through wrongful acts or passive acceptance of a benefit that would be unconscionable to permit the defendant to retain." R. Zoppo Co., Inc. v. City of Manchester, 122 N.H. 1109, 1113 (1982).  Assuming that Hansen's actions would constitute wrongful conduct sufficient to entitle Wilcox to restitution, the claim nonetheless fails because all of the allegations are based on the same facts as the misappropriation claim.  Hansen's unauthorized use of information about the device to develop a competing product and his unauthorized use of information about Wilcox's customers to solicit their business are the actions that form the basis of the misappropriation claim.  In the absence of an allegation of unjust enrichment independent of misappropriation, the claim is preempted by the NHUTSA.

---

rather than a contract claim.  Accordingly, I analyze whether the NHUTSA preempts it.  I note, however, that even if the claim is not preempted, I would grant the motion to dismiss because the claim merely restates Wilcox's breach of contract claim. See Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210-11 (2009) ("It is a well-established principle that the court ordinarily cannot allow recovery under a theory of unjust enrichment where there is a valid, express contract covering the subject matter at hand.").

**B.   Sufficiency of Pleading as to Remaining Claims**

With respect to the claims to which the NHUTSA preemption does not apply, defendants move for dismissal on the basis of the insufficiency of the pleadings.  I examine each remaining claim to determine whether Wilcox has alleged facts that state a plausible case for relief.

**1.   Misappropriation of Trade Secrets Claim (Count V)**

Wilcox's chief claim is that defendants misappropriated its trade secrets in violation of the NHUTSA.  The NHUTSA defines "misappropriation," in relevant part, as "use of a trade secret of another without express or implied consent by a person who," at that time, "knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it." N.H. Rev. Stat. Ann. § 350-B:1, II.  A trade secret is defined as information that "[d]erives independent economic value . . . from not being generally known" and that "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id. § 350-B:1, IV.  The term "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy."  Id. § 350-B:1, I.

To state a claim for misappropriation under the NHUTSA, Wilcox must plead facts sufficient to establish that (1) it had a trade secret; (2) defendants used it; and (3) defendants knew or had reason to know that they obtained knowledge of the trade secret through a breach of confidence reposed in them.  See id. § 350-B:1.

Defendants argue that Wilcox's complaint fails to plausibly allege all elements of the claim, particularly the existence of a trade secret.  Accepting as true all the factual allegations that Wilcox makes, and drawing reasonable inferences in its favor, I find otherwise.

First, Wilcox has sufficiently pled the existence of trade secrets.  It describes the misappropriated trade secrets as various features of its next-generation PATRIOT device, including: design specifications; materials specifications; and information relating to the development of parts and components, and to the manufacturing and assembly processes.  In addition, Wilcox contends that its customer information, marketing strategies, and details of its contracts and communications with its current and prospective customers are protected trade secrets.  Although defendants argue that those allegations do

not sufficiently identify the trade secrets at issue, the level of specificity is sufficient at this stage of the case because Wilcox identifies the trade secrets in relation to a specific product – its next-generation PATRIOT device.  See, e.g., Eastman Chem. Co. v. AlphaPet Inc., Civ.A. 09-971-LPS-CJB, 2011 WL 5402767, at *6 (D. Del. Nov. 4, 2011) (refusing to dismiss a misappropriation claim where the plaintiff identified trade secrets as information relating to a particular product and noting that "[w]hen trade secrets are identified by reference to a trade name . . . courts in this circuit have refused to dismiss misappropriation claims"); Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc., No. 10–cv–032428–LHK, 2011 WL 1044899, at *5 (N.D. Cal. Mar. 23, 2011) (finding that the complaint plausibly alleged trade secrets where it broadly alleged the defendant's misappropriation of the plaintiff's "design of its ServerIron and ADX products, related software including source code, customer information, and employee information"); Reckitt Benckiser Inc. v. Tris Pharma, Inc., Civ. No. 09–3125(FLW), 2011 WL 773034, at *4 (D.N.J. Feb. 28, 2011) (refusing to dismiss trade secret claim where the confidential information was identified as "the Delsym® manufacturing process, Delsym®

26

formulations, and other private information concerning Delsym®
and related research and development").

Furthermore, Wilcox's allegations are sufficient to meet
both prongs of the trade secret definition.  Information
regarding its next-generation product and its customers derives
independent economic value from not being generally known.  See
Contour Design, Inc. v. Chance Mold Steel Co., LTD., Civ. No.
09-cv-451-JL, 2010 WL 174315, at *5 (D.N.H. Jan. 14, 2010) ("A
number of courts have applied the [Uniform Trade Secrets] Act to
confidential disclosures of concepts, or as yet-untested, ideas
for a new product or a new process.") (internal quotation marks
omitted); Mortgage Specialists, 153 N.H. at 771-72 (assuming
that confidential customer information has economic value and
discussing whether the plaintiff's efforts to maintain secrecy
were reasonable); Carriage Hill Health Care, Inc. v. Hayden, No.
CIV. 96-101-SD, 1997 WL 833131, at *5, *7 (D.N.H. Apr. 30, 1997)
(noting that some information about the plaintiff's customers
derives economic value due to "the expenditure of time, money,
and energy necessary to initiate creative and individualized
plans of marketing fostering constructive competitive results,"
and is thus protectable as a trade secret).

27

Wilcox's complaint, moreover, sets forth specific factual allegations as to the actions it took to protect confidential information regarding its next-generation device and its customers.  Wilcox required employees exposed to the information to sign confidentiality agreements as a condition of their employment, and it outfitted its facilities that contain confidential information with security systems that restricted access to specific employees.  Those actions suggest that the information was subject to reasonable efforts to prevent it from being generally known to the public.  See MedioStream, Inc. v. Microsoft Corp., 749 F. Supp. 2d 507, 516 (E.D. Tex. 2010) (holding that factual allegation regarding the specific steps that the plaintiff implemented to protect the information rendered plausible the allegation that the information was not generally known to the public).  Hence, Wilcox has sufficiently pled the existence of trade secrets.

With regard to the second prong of its misappropriation claim, Wilcox has alleged that defendants incorporated trade secret information regarding its next-generation PATRIOT device into a competing product and that they used its confidential customer information to solicit the business of those customers.

It has thus sufficiently pled that defendants are using its trade secrets.

The third prong of the claim requires Wilcox to allege that its trade secrets were misappropriated.  It must make sufficient factual averments that defendants used its trade secrets despite knowing or having reason to know that they obtained knowledge of those trade secrets through improper means.  See N.H. Rev. Stat Ann. § 350-B:1.  Wilcox has met its burden with respect to this element as well.  It has alleged that defendants gained knowledge of the trade secrets through their confidential relationships with Wilcox, namely Hansen's prior employment and ALST's subsequent consulting arrangement with Wilcox.  Both relationships gave rise to a duty to maintain secrecy, especially in light of the nondisclosure agreement between Hansen and Wilcox and a similar understanding with ALST during the consulting arrangement.  See Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985) ("a confidential relationship typically will be implied where disclosures have been made in business relationships between employers and employees, purchasers and suppliers, or prospective licensees and licensors" (internal citations omitted)).  Defendants are

alleged to have breached the confidence reposed in them by using Wilcox's trade secrets for their own benefit.  Thus, Wilcox has sufficiently pled the last element of the claim.

Because Wilcox has plausibly alleged sufficient facts to allow me to reasonably infer both the existence of trade secrets and that defendants misappropriated those secrets, I deny defendants' motion with respect to the NHUTSA claim.

### 2.  __Breach of Contract Claim (Count I)__

Hansen also moves to dismiss Wilcox's breach of contract claim against him as insufficiently pled.  Specifically, he argues that Wilcox has failed to sufficiently identify a breach because it did not allege "what confidential information [] Hansen has allegedly disclosed, how such disclosures have been made, or to whom the disclosures were made."  D.'s Mem. in Supp. of Summ. J. at 18, Doc. No. 11.  In addition, in its reply to Wilcox's memorandum in opposition to the motion, Hansen argues that Wilcox has inadequately pled damages.  Neither argument is persuasive.

In order to state a breach of contract claim under New Hampshire law, Wilcox must allege sufficient facts to show (1) that a valid, binding contract existed between the parties, and

(2) that Hansen breached the terms of the contract.  See
Lassonde v. Stanton, 157 N.H. 582, 588 (2008); Bronstein v. GZA
GeoEnvironmental, Inc., 140 N.H. 253, 255 (1995).  "A breach of
contract occurs when there is a failure without legal excuse to
perform any promise which forms the whole or part of a
contract."  Lassonde, 157 N.H. at 588 (quoting Poland v. Twomey,
156 N.H. 412, 415 (2007) (alterations omitted)).

    Notwithstanding Hansen's argument to the contrary, damages
need not be pled separately from breach in a claim for breach of
contract.  See Bronstein, 140 N.H. at 255 ("[A] cause of action
arises once all the necessary elements are present.  In the case
of torts, it would be when the causal negligence is coupled with
harm to the plaintiff.  In the case of a contract action, it
would be when the breach occurs." (internal quotation marks,
alterations, and ellipses omitted)); see also RealTrust IRA
Alts., LLC v. Entrust Group, Civ. No. 10-CV-382-LM, 2011 WL
1033706, at *4 (D.N.H. Mar. 21, 2011) ("[A]ccording to
Bronstein, it would appear in a tort claim, breach of duty and
injury are separate elements while, in a breach of contract
claim, a breach is presumed to cause injury.").  Although Wilcox
would have to prove damages to prevail on the contract claim, it

31

need not allege damages separately from an allegation of breach. See RealTrust IRA Alts., 2011 WL 1033706 at *4 ("[R]equiring a plaintiff [to] prove damages in a contract action is hardly the same thing as requiring that plaintiff to allege injury separately from an allegation of breach.").

With respect to the two elements that Wilcox must plausibly allege – a valid contract and a breach of that contract – it has met its burden at this stage of the case. Wilcox alleges that it entered into two enforceable agreements with Hansen: the Nondisclosure and Nonsolicitation Agreement ("NDA") and the Royalty Agreement. It further alleges that Hansen breached both of those agreements: (1) he breached the NDA by disclosing to ALST the confidential information about Wilcox's technology that he agreed not to disclose; and (2) he breached the Royalty Agreement by using the same technology that he assigned to Wilcox to develop a competing product. Because these allegations are sufficient to meet the plausibility requirement of Iqbal, I deny Hansen's motion with respect to the breach of contract claim.

    **3.**    **Breach of Implied Covenant of Good Faith and Fair Dealing (Count III)**

Lastly, Hansen moves to dismiss the claim for breach of the implied covenant of good faith and fair dealing.  Because the factual allegations made in support of this claim distinguish it from those in which a good faith and fair dealing claim has been held appropriate, I grant the motion.

In Centronics Corp. v. Genicom Corp., the New Hampshire Supreme Court explained that it has "relied on such an implied duty in three distinct categories of contract cases: those dealing with standards of conduct in contract formation, with termination of at-will employment contracts, and with limits on discretion in contractual performance." 132 N.H. 133, 139 (1989).  Wilcox argues that its claim against Hansen falls into the third category.  After describing several cases in the third category, the Centronics court summarized:

> Despite the variety of their fact patterns, these cases
> illustrate a common rule: under an agreement that appears
> by word or silence to invest one party with a degree of
> discretion in performance sufficient to deprive another
> party of a substantial proportion of the agreement's value,
> the parties' intent to be bound by an enforceable contract
> raises an implied obligation of good faith to observe
> reasonable limits in exercising that discretion, consistent
> with the parties' purpose or purposes in contracting.

Id. at 143.

Here, Wilcox has not sufficiently alleged that the agreements at issue vest Hansen with discretion in performance or that he exercised such discretion in a manner that denied Wilcox an essential benefit of the bargain.  On the contrary, Wilcox alleges that the agreements expressly bar Hansen from disclosing or using confidential information pertaining to Wilcox's life support technology.  In asserting the claim, Wilcox thus fails to recognize that "the duty of good faith and fair dealing ordinarily does not come into play in disputes between commercial actors if the underlying contract plainly spells out both the rights and duties of the parties and the consequences that will follow from a breach of a specified right."  Milford-Bennington R.R. Co., Inc. v. Pan Am Railways, Inc., No. 10-CV-00264-PB, 2011 WL 6300923, at *5 (D.N.H. Dec. 16, 2011); see Centronics, 132 N.H. at 143-45.

In stating the claim, Wilcox merely complains in a general manner that "Hansen has breached this implied covenant by acting in bad faith in performance of his obligations pursuant to [the two agreements]."  Compl. ¶ 34, Doc. No. 1.  The implied covenant of good faith and fair dealing does not provide a remedy when the plaintiff alleges only that the defendant

breached the contract in bad faith.  Therefore, Wilcox has insufficiently pled the claim and I grant Hansen's motion to dismiss it from the complaint.

## IV.   <u>CONCLUSION</u>

For the aforementioned reasons, I grant defendants' motion to dismiss (Doc. No. 11) with respect to Counts II, IV, VI, VII, and VIII (to the extent it asserts a claim for intentional interference with existing contractual relations).  I deny the motion with respect to Counts I, III, V, and VIII (to the extent it asserts a claim for intentional interference with prospective contractual relations).  Because I have determined that Wilcox has sufficiently pled Counts I and V of the complaint, I also deny defendants' motion for a more definite statement (Doc. No. 12).

SO ORDERED.

<u>Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

May 7, 2012

cc:  Jeremy Walker, Esq.
     Nicholas Casolaro, Esq.
     Stephen Mosier, Esq.
     Todd Sullivan, Esq.

35